UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff, | * | CASE NO. |
| | * | |
| v. | * | |
| | * | |
| Anil KUMAR, Manoj KUMAR, | * | |
| Mandeep SINGH | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

## DECLARATION OF TRACI HORRACH

I, Traci Horrach, declare as follows:

1. I am employed as a Supervisory Detention and Deportation Officer (SDDO) with the U.S. Department of Homeland Security (Department), U.S. Immigration and Customs Enforcement (ICE), in the Atlanta, Georgia Field Office. I am currently assigned to the Stewart Detention Center (SDC) in Lumpkin, Georgia. I am the SDDO for the Defendants. I am providing this declaration based upon my personal knowledge and review of administrative records.

2. Defendant Anil KUMAR (AXXX XXX 785) is a citizen of India who is currently detained by the Department at SDC in Lumpkin, Georgia. KUMAR entered the United States illegally from Mexico near the Otay Mesa, California port of entry on November 16, 2017. Thus, he was charged with being removable from the United States under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act) as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border

crossing card, or other valid entry document required by the Act. KUMAR is scheduled for a hearing before an immigration judge on May 17, 2018.

3. Defendant Mandeep SINGH (AXXX XXX 679) is a citizen of India who is currently detained by the Department at SDC in Lumpkin, Georgia. SINGH entered the United States illegally from Mexico near the Calexico border on December 17, 2017. Thus, he was charged with being removable from the United States under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act) as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act. SINGH is scheduled for a hearing before an immigration judge on June 19, 2018.

4. Defendant Manoj KUMAR (AXXX XXX 747) is a citizen of India who is currently detained by the Department at SDC in Lumpkin, Georgia. KUMAR entered the United States illegally from Mexico near the Chula Vista border on November 14, 2017. Thus, he was charged with being removable from the United States under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act) as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act. KUMAR is scheduled for a hearing before an immigration judge on June 28, 2018.

5. Defendants are currently refusing nutrients, medical tests, and medications necessary to sustain their life. Defendants have refused to eat since April 17, 2018. Plaintiff has made reasonable efforts to persuade Defendants to comply with necessary medical treatment and to end their hunger strike to no avail. The medical staff at the SDC is closely monitoring their condition.

6. Since the Defendants began the hunger strike, both the medical staff at SDC and the detention and removal staff of ICE have tried to convince the Defendants to end their hunger strike and eat. It has been explained to them that if they continue to refuse necessary nutrients, laboratory tests, and medication, their health will be seriously jeopardized and they will eventually die. Despite repeated efforts to convince the Defendants to comply, they have failed to cooperate.

7. The medical staff at the SDC has informed me that if the Defendants continue to refuse necessary nutrients and medical treatment, it will be necessary to perform laboratory tests and physical evaluation to monitor and assess the Defendants' clinical condition in order to save their life. In addition, the medical staff at the SDC has informed me that if the Defendants continue to refuse necessary nutrients and medical treatment, it will be necessary to administer nutrients by nasogastric tube and/or intravenous feeding because the Defendants' lives are in danger.

8. The death of the Defendants, as a result of this refusal to cooperate, would seriously affect the operation of SDC and would adversely affect my ability and the Department's efforts to maintain the security and good order of this detention facility in the following ways:

   a. Perceptions may be formed by the detained population that the detention and removal staff will simply let the Defendants die, without doing anything to save them, which could lead to acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the detention facility. I am concerned that food strikes or other disruptive

or violent acts would be directed at staff or against government property, in order to express the detainees' anger, resentment, and frustrations.

b.  If such disruptive acts were to occur, tensions between detainees and staff would be heightened and increased, making almost all aspects of the detention operation more difficult for staff to perform.

c.  For a detainee to cause his own death without staff intervention would totally thwart the Department's obligation to render appropriate medical care and prevent detainee suicides. Other detainees may decide to commit suicide by starving themselves to death.

d.  Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at SDC to administer their medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

e.  Detainees who participate in hunger strikes may severely and permanently damage their state of health, requiring the Department to unnecessarily expend large sums of money for their immediate and long-term medical care.

f.  Other detainees will actually participate in hunger strikes in attempts to manipulate the staff in efforts to gain various benefits and privileges. For example, detainees may initiate hunger strikes in an attempt to pressure staff to transfer them away from SDC, or to gain their release from detention. Without the ability to intervene when medically necessary, the detention facility will be

4

forced to allow the detainee to die – in contravention of the Department's legal and ethical obligations.

g. Some detainees will merely voice threats to go on a hunger strike, gaining additional staff attention, drawing their attention away from other detainees, and making staff apprehensive in their approach to such detainees.

h. Under the law as I understand it, I have an obligation to uphold the Detention Standards set forth in the Detention Operations Manual, which include an obligation to ensure appropriate medical care to detainees and to act to preserve and protect detainees' lives while they are detained in the custody of the Department. If detainees are not force fed when medically necessary, the failure to provide such medical care could expose the United States Government and its employees to various claims of liability and lawsuits from family members of deceased detainees who assert that the Department, through Immigration and Customs Enforcement, should have acted to prevent the detainee's death by force-feeding the detainee, but did not. Whether or not the family members would ultimately win the claims and cases, the burdens of responding to claims and litigation would result in a drain of staff time and resources and distract staff from their regular duties of ensuring the safety and orderly operation of the detention facility.

9. For the reasons stated above, the adverse effects resulting from not being able to perform the necessary laboratory tests and physical evaluation to monitor and assess the Defendants' clinical condition would harm the Department's ability to operate in a safe and orderly manner. Further, after their laboratory tests have

been completed and it is determined that their clinical condition has deteriorated to a level that is adverse to his health, to not force-feed them could potentially result in severe disruption to the detention facility.

10. In my judgment, to save these detainees and to protect facility security and good order, it is necessary to perform laboratory tests, physical evaluations to monitor and assess the Defendants' clinical condition and if deemed necessary, to involuntarily administer nutrients to the Defendants.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of May 2018.

_____
Traci Horrach
Supervisory Detention and Deportation Officer
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Lumpkin, Georgia